ARGONAUT INSURANCE
COMPANY, Petitioner,

v.

Arthur PATTERSON, Savannah Machine & Shipyard Company, Liberty Mutual Insurance Company and Continental Insurance Company; and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.

No. 87–8491.

United States Court of Appeals,
Eleventh Circuit.

June 8, 1988.

Richard J. Harris, Brennan, Harris & Rominger, Savannah, Ga., for Argonaut Ins. Co.

John P. Reale, Drew, Eckl & Farnham, Atlanta, Ga., for Savannah.

B.H. Levy, Jr., Bouhan, Williams & Ivey, Randall K. Bart, Peter D. Muller, Savannah, Ga., for Liberty.

Hunter, MacLean, Exley & Dunn, Jonathan D. Sprague, R. Nathaniel Rackett, III, Savannah, Ga., for Continental Ins. Co.

Middleton & Anderson, Eugene C. Brooks, IV, Savannah, Ga., for Patterson.

Janet R. Dunlop, U.S. Dept. of Labor, Office of the Solicitor, Washington, D.C., for OWCP.

Before HILL and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

HILL, Circuit Judge:

Arthur Patterson brings this claim for compensation under the Longshore and Harbor Workers' Compensation Act ("the Act"), 33 U.S.C. §§ 901–950 (1986). From 1956 to 1980 Arthur Patterson was employed with the Savannah Machine & Shipyard Company. During the majority of his years with Savannah Machine, Patterson was a sandblaster. Patterson contracted silicosis from his constant exposure to dust, and has been found to be permanently disabled as a result of the disease.

In 1974 the Georgia Health Department x-rayed all the Savannah Machine employees at the shipyard where Patterson worked. Authorities concluded that Patterson's x-ray was abnormal, and a doctor diagnosed his condition as silicosis, with an alternate diagnosis of tuberculosis. Although further tests indicated that Patterson did not have tuberculosis, Patterson received a one-year treatment designed to prevent tuberculosis. Dr. Walter W. Otto of the Chatham County (Georgia) Health Department treated Patterson in 1974 and 1975. Dr. Otto explains that it is likely he discussed silicosis with Patterson, but he has no notes describing their discussions and is not certain. R–1045. Patterson's "Employee's Claim for Compensation" form listed the date of injury as 1974. R–975. Patterson testified that in 1975 Dr. Otto informed him that his condition resulted from silicosis. R–539.

Dr. Otto believes that after the 1974 x-rays his office probably notified Savannah Machine of silicosis in several employees. R–1045–1047. Patterson's personal doctor, Dr. Charles P. Ryan, testified that sometime after July, 1977, he sent a letter

to Patterson's employer explaining that work site dust was causing his patient problems. R–957. The ALJ found that it was "uncontroverted" that Patterson informed Savannah Machine of the problem sometime during 1975. R–743. Frank Lacy, claimant's supervisor at Savannah Machine, did not recall being told of Patterson's silicosis as early as 1975. R–1097–1098; R–1111–1114.

In any event, by 1975 Patterson knew that he should avoid dust, and at times was moved to less dusty working areas because of his condition. R–740. At no point during 1974 or 1975 was claimant ever in poor health or did he ever miss any work because of the silicosis. *Id.* In 1975, at the end of the one-year treatment for preventing tuberculosis, Dr. Otto told the claimant that he had successfully completed the course of treatment. R–1038.

On June 27, 1977, while working in an especially dusty area, claimant became ill for the first time. X-rays revealed a lesion in his lungs. R–740–741. During 1977, claimant twice missed approximately one month of work because of the silicosis. R–751. Patterson testified that a foreman asked him why he had to miss work, and that he "finally" told the foreman of the problem. R–833. As early as July 9, 1977, the employer authorized medical attention for the claimant. R–741. On October 17, 1977, a few months after claimant first became ill, the employer filed the Employer's First Report of Accident or Occupational Illness. *Id.* Patterson filed his claim for disability on December 9, 1977. *Id.*

Claimant was treated periodically in 1977 and 1978; during that time Patterson's health depended on the working conditions to which he was exposed. R–741. On January 5, 1979, claimant was reassigned to "light duty work," in which he continued to be employed sporadically until mid–1980. R–745. The light duties assigned to claimant consisted primarily of picking up trash in the shipyard. R–745. J.R. Harrington, a member of the Industrial Relations De-

partment at Savannah Machine, stated that Patterson had been "treated with kid gloves," R–893, and that if plaintiff left the job the employer would "not necessarily," R–876, hire someone else to fill the job.

Up until March 9, 1976, Savannah Machine was insured with Argonaut Insurance Company. From March 9, 1976, to July 15, 1977, the employer was insured with Continental Insurance Company, and from that point until July 15, 1979, the employer was insured with Liberty Mutual. On July 15, 1979, Savannah Machine became self-insured. R–739.

The Administrative Law Judge ("ALJ") found that Patterson was temporarily totally disabled from July 11, 1977, to August 1, 1977, and from November 27, 1977, to December 16, 1977. According to the ALJ, Patterson became permanently and totally disabled as of January 5, 1979, when he was reassigned to light duty in the shipyard. The ALJ charged Liberty Mutual with the liability for all three periods of disability. R–751. The ALJ specifically considered the fact that Savannah Machine had retained the claimant in "light duty" after January 5, 1979, but determined that the wages Patterson had received for his work were not merited by the light duties he performed. Consequently, Patterson's continued employment was at the "benevolence" of the employer, and the fact that Patterson continued to work did not contradict the finding of total disability. R–748–749.

The ALJ found that Patterson had filed a timely claim given the fact that he first became aware of a *disability* in 1979, and alternatively held the claim timely either because Patterson was entitled to the tolling provision set forth in section 30(f), 33 U.S.C. § 930(f),[1] or because Savannah Machine had constructive knowledge of the injury to Patterson. R–743–744.

Liberty Mutual appealed to the Benefits Review Board ("the Board"). The Board determined that Patterson became "aware" of his disability and the fact that it was

1. Under section 30(f), if an employer has knowledge of the injury to the employee, the one-year statute of limitations does not begin to run until

the employer files the report of injury mandated by section 30(a), 33 U.S.C. § 930(a).

work-related sometime between December, 1974, and April, 1975. *Patterson v. Savannah Machine & Shipyard,* 15 Ben.Rev.Bd. Serv. 38, 40 (1982). Although Patterson did not file his claim until 1977, the Board nevertheless found the claim timely under the tolling provision in section 30(f). *Id.* at 40–41. The Board upheld the finding of total disability, and the conclusion that employment subsequent to January 5, 1979, was at the beneficence of the employer. *Id.* at 42–43. The Board refused the employer's request for a credit for wages paid, noting that the Act makes no provision for such an offset. *Id.* at 43.

The Board remanded for consideration of the issue of whether the employer was entitled to the liability limitation in section 8(f), 33 U.S.C. § 908(f). *Id.* at 43. The ALJ decided that the special fund set up by 33 U.S.C. § 944 could be used pursuant to section 8(f) to relieve the employer of full liability. R–114.

The Director appealed the award of section 8(f) relief, and Argonaut appealed the ALJ's ruling that the statute of limitations ought to be tolled because Savannah Machine had actual knowledge of Patterson's condition in 1975. The Board stated that in its first opinion it had "fully considered," R–3, the issue raised by Argonaut, and affirmed the 8(f) relief contested by the Director.[2] R–4.

Argonaut appealed to this court, presenting four issues for our review. Argonaut first challenges the date of injury selected by the Board, and the choice of liable carrier which flowed from the designation of the date. Next Argonaut takes issue with the finding by the Board and by the ALJ that the time for filing Patterson's claim was tolled because the employer was aware of the injury. Thirdly Argonaut maintains that, given Patterson's subsequent employment at Savannah Machine, the Board and the ALJ incorrectly determined that Patterson was totally and permanently disabled. Finally Argonaut contests the Board's finding that Savannah Machine was not enti-

tled to a credit against disability benefits for wages paid to Patterson after the date of disability.

Our review of the Board's two opinions is limited: "[a]lthough the standard of review in this Court is not set out in the statute, it is evident that we are to review only for errors of law, and to make certain that the Board adhered to its statutory standard of review of factual determinations." *Presley v. Tinsley Maintenance Service,* 529 F.2d 433, 436 (5th Cir.1976). *See also American Mutual Liability Ins. Co. v. Smith,* 766 F.2d 1513, 1515 n. 3 (11th Cir.1985).

## I. THE DATE OF INJURY AND THE LIABLE CARRIER

### A. *The Rule for Allocating Liability.*

Faced with the difficult task of assigning liability among a host of potentially liable carriers, the Second Circuit enunciated a standard geared to easing the assignment process:

> [W]e conclude that the Congress intended that the employer during the last employment in which the claimant was exposed to injurious stimuli, prior to the date upon which the claimant became aware of the fact that he was suffering from an occupational disease arising naturally out of his employment, should be liable for the full amount of the award.... [T]he treatment of carrier liability was intended to be handled in the same manner as employer liability, and ... the carrier who last insured the "liable" employer during claimant's tenure of employment, prior to the date claimant became aware of the the [sic] fact that he was suffering from an occupational disease arising naturally out of his employment, should be held responsible...."

*Travelers Insurance Company v. Cardillo,* 225 F.2d 137, 145 (2d Cir.), *cert. denied,* 350 U.S. 913, 76 S.Ct. 196, 100 L.Ed. 800 (1955). "The underlying rationale [of the *Cardillo* rule] is that all employers will be

---

**2.** No party has appealed the award of 8(f) relief, and we make no affirmation of the decision to   award such relief.

the last employer a proportionate share of the time." *Cordero v. Triple A Mach. Shop,* 580 F.2d 1331, 1336 (9th Cir.1978), *cert. denied,* 440 U.S. 911, 99 S.Ct. 1223, 59 L.Ed.2d 459 (1979). The *Cardillo* rule has been adopted in this circuit. *See, e.g., Fulks v. Avondale Shipyards, Inc.,* 637 F.2d 1008 (5th Cir.), *cert. denied,* 454 U.S. 1080, 102 S.Ct. 633, 70 L.Ed.2d 613 (1981).

Much of the controversy in this case revolves around selecting the date at which Patterson became "aware" that he was "suffering from an occupational disease arising naturally out of his employment...." *Cardillo,* 225 F.2d at 145.

### B. *The Effect of Cordero.*

■ Argonaut contends that the *Cardillo* rule has been modified by *Cordero.* We note initially that we have not expressly adopted *Cordero* in this circuit.[3]

Argonaut urges us to follow *Cordero*'s lead by emphasizing the time disability occurred:

> Because the onset of disability is a key factor in assessing liability under the last-injurious-exposure rule, it does not detract from the operation of this rule to show that the disease existed under the prior employer or carrier, or had become actually apparent, or had received medical treatment, so long as it had not resulted in disability....

*Cordero,* 580 F.2d at 1337. *Cordero*'s focus on the date of disability presages the 1984 amendments to the Act, Argonaut suggests. Argonaut maintains that no disability evidenced itself until Patterson missed work in 1977, or until Patterson was assigned to less strenuous tasks in 1979.

Liberty Mutual and Continental urge us to ignore the *Cordero* case, suggesting that the language cited by Argonaut is merely dictum which was never intended to extend to the situation at hand. The two insurers add that a ruling by the Ninth Circuit should not be used to modify one by the Second Circuit; they argue that principle is especially strong where, as in these two cases, the courts addressed problems set against different factual backgrounds.

Liberty Mutual and Continental wrongly characterize the holding in *Cordero* when they term it "dictum." In *Cordero* the employer, Triple A, contended that its due process rights were violated when it was charged with full disability liability merely because it was Cordero's last employer. While the court did not detail the inception and development of Cordero's disease, we feel confident that Triple A would not have raised the constitutional issue and the Ninth Circuit would not have decided it had not both believed some third party might be liable if the injury were dated from some point other than the injury's development into disability. Further, while the court dealt specifically with the question of whether the rule was constitutional, it upheld the rule's constitutionality "[b]ecause the onset of disability is a key factor *in assessing liability....*" *Cordero,* 580 F.2d at 1337 (emphasis supplied).

Today we adopt the *Cordero* rule, observing that it modifies *Cardillo* in a manner appropriate to Patterson's situation. First, the *Cardillo* court expressly held that liability will be triggered at the point when the claimant becomes aware that he is "suffering" from the work-related disease. While the term itself does not produce the *Cordero* holding, "suffering" has very particular connotations which we cannot assume the Second Circuit meant to ignore. Moreover, the *Cordero* doctrine produces a very logical extension of *Cardillo* in this case. Patterson may have had reason to suspect a disease in 1974 or 1975, but he had no reason to suspect a crippling disability; the insurers presented no evidence that in 1974 or 1975 Patterson was "aware" that his disease would ultimately disable him. In fact, the testimony showed that Patterson suffered no silicosis-related

---

**3.** We have referred to *Cordero* twice, once as support for the general principle that liability is placed on the last employer, *Smith v. Aerojet-General Shipyards, Inc.,* 647 F.2d 518, 523 (5th Cir. Unit B June 1981), and a second time as standing for the proposition that an employment injury which aggravates a preexisting medical condition can be a compensable "injury." *Bludworth Shipyard, Inc. v. Lira,* 700 F.2d 1046, 1049 (1983).

illness until 1977, and that he filed his claim within a few months of the first time he became ill.

Most significantly, we affirm the *Cordero* holding because it does little more than portend the 1984 amendments which we hold apply to this case.

### C. *The 1984 Amendments.*

In 1984 Congress amended the Longshore and Harbor Workers' Compensation Act. Formerly section 12(a), 33 U.S.C. § 912(a), required an employee to give his or her employer notice of a claim within 30 days of the time the employee became aware: "of the relationship between the injury or death and the employment." H.R.Rep. No. 98–570, Part I, 98th Cong., 2d Sess. 10, *reprinted in* 1984 U.S.Code Cong. & Ad.News 2734, 2743. Former section 13 barred a claim unless the claimant filed it: "within one year after the injury or death." *Id.* In proposing amendments to the statute, the House committee explained: "[t]he term 'injury' in both these provisions has little applicability in the context of a disability or death which is the result of a long-latency occupational disease, and this language has resulted in decisional law which the Committee finds troublesome." *Id.*

In the 1984 amendments, Congress added to section 12(a) the provision that: "in the case of an occupational disease which does not immediately result in a disability or death, such notice shall be given within one year after the employee or claimant becomes aware ... of the relationship between the employment, the disease, and the death or disability." 33 U.S.C. § 912(a). Section 13 now reads:

[A] claim for compensation for death or disability due to an occupational disease which does not immediately result in such death or disability shall be timely if filed within two years after the employee or claimant becomes aware ... of the relationship between the employment, the disease, and the death or disability....

33 U.S.C. § 913(b)(2). Congress made a similar provision for setting the date from which to compute the employee's average weekly wage. *See* 33 U.S.C. § 910(i).

The 1984 amendments apply to claims pending on September 28, 1984, the date on which the amendments took effect. Longshore and Harbor Workers' Compensation Act, Pub.L. No. 98–426, § 28, 98 Stat. 1639, 1655 (1984). In 1984 Patterson's claim was pending before the Board for the second time, so we must use any applicable amendments in deciding this case.[4]

Liberty Mutual argues that sections 10(i), 12 and 13 should not govern anything other than the notice and filing dates which they are to establish. Liberty Mutual maintains that the provisions should not be used in deciding which carrier to hold liable.

A close reading of the legislative history of the 1984 amendments to sections 10(i), 12 and 13 forces us to disagree with Liberty Mutual. The House committee report specifically stated that: "it is the disability which should trigger the compensation claim...." H.R.Rep. No. 98–570, Part I, 98th Cong., 2d Sess. 10, *reprinted in* 1984 U.S.Code Cong. & Ad.News 2734, 2743. That wording implies that the claim itself, including any attendant liability, cannot begin until the disability does.[5]

The rule for allocating insurer liability was judicially created;[6] given that Con-

---

4. Because Patterson's case was pending before the Review Board at the time the amendments were enacted, we need not determine whether we will adhere to one of the positions taken by the Ninth Circuit in *Osmundsen v. Todd Pacific Shipyard,* 755 F.2d 730, 732–33 (9th Cir.1985). In *Osmundsen,* the Ninth Circuit decided that the 1984 amendments would apply to claims pending before the appellate court as well as to claims subject to further administrative review.

5. The committee explained that a disability occurs: "when the employee's disease condition

impairs his or her functional capacity, or when the disease condition has resulted in a reduction of wages." H.R.Rep. No. 98–570, Part I, 98th Cong., 2d Sess. 11, *reprinted in* 1984 U.S.Code Cong. & Ad.News 2734, 2744.

6. *See Cardillo,* 225 F.2d at 145 (while Congressional intent could be discerned as to the allocation of liability among employers, the court was forced to "grop[e] in the dark" for a rule addressing liability among different insurers).

gress has legislated in the area recently, we would be remiss were we not to reexamine our judicial rule to assure that it comports with Congress' latest rule-making. In the 1984 amendments Congress mandated that courts consider the date of disability in designating statutorily relevant dates. The present judicial rule does not reach the situation we have here, and it would be inappropriate for us to refine the rule, as we must today, without reference to the new factor Congress has deemed pertinent. *Cf. Cardillo*, 225 F.2d at 145 ("it would seem far more in keeping with the Congressional recognition of the overriding importance of efficient administration in this area, to conclude that the treatment of carrier liability was intended to be handled in the same manner as employer liability...").

We conclude, then, that the 1984 amendments are relevant to our choice of the carrier liable for Patterson's claim.

### D. *Applying the Act to Patterson's Situation.*

■ The amended Act requires us to ask when the claimant became aware "of the relationship between the employment, the disease, and the death or disability." 33 U.S.C. § 912(a). The ALJ incorrectly applied this legal standard in determining that Patterson was not disabled until 1979, almost two years after Patterson had missed a substantial amount of work because of his illness.[7] The ALJ finding amounted to a conclusion that an employee "aware" enough to file for relief in 1977 actually was not disabled until 1979. While

perhaps the conclusion would be valid under some set of circumstances, this case does not present such a factual scenario. When the employee missed work in 1977, he should have been able to connect his employment-caused illness[8] with a compensable disability. At that point, the employee's condition most certainly met the definition of disability: an "incapacity because of injury to earn the wages which the employee was receiving at the time of injury...." 33 U.S.C. § 902(10). While Congress desired to relax the requirements placed upon employees suffering long-latency diseases, we cannot presume that Congress intended to postpone the date of injury indefinitely.

Similarly, the Board incorrectly applied the post-amendments legal standard in suggesting that the employee became disabled by 1974 or 1975.[9] While arguably Patterson knew he had a disease linked to his employment, the evidence does not support and the board does not offer a finding that Patterson then realized the disease's connection to a disability which had not yet occurred.[10]

■ We hold that Patterson should have become aware of the connection between his disability, his disease, and his employment when he first missed work because of his disease.[11] At that juncture Patterson should have realized that he had developed an "incapacity because of injury to earn the wages," 33 U.S.C. § 902(10), which he had previously received. The carrier "on the risk" when Patterson first missed work was Continental, and pursuant to *Cardillo, Cordero,* and the 1984 amendments to the

7. Both of the ALJ's decisions were rendered before the 1984 amendments but after *Cordero.*

8. The ALJ found that in 1974–1975 Patterson had not yet realized his illness was employment-related. R–740. The Board disagreed. *Patterson,* 15 Ben.Rev.Bd.Serv. at 40. Without contradicting either decisionmaker we may observe that Patterson must have linked his employment to his illness when he became ill in the dusty work area in 1977. Since injuries increasing disability are compensable, 33 U.S.C. § 908(f), Patterson need not have realized that his work had caused his condition, so long as he understood that it had aggravated his disease.

9. The Board made both its decisions after *Cordero;* only the second decision post-dated the 1984 amendments.

10. We do not decide today whether under some set of circumstances an employee might become aware, in advance of any disability, that he or she had contracted a disease which in its final stages would result in disability.

11. An essential element of this holding is our conclusion that by the time of his first absence from work Patterson knew or should have known of the connection between his disease and his employment. To trigger a claim, an employee must be aware of the links between all three statutory elements.

Longshore and Harbor Workers' Compensation Act, we hold Continental liable for the full amount of the disability award.

## II. THE TIMELINESS OF PATTERSON'S CLAIM

Both the ALJ and the Board ruled that Patterson had filed a timely claim. The Board determined that while Patterson had not filed within one year of the time he became "aware" in the statutorily relevant sense, section 30(f) tolled the statute of limitations until the employer filed its Report of Accident or Occupational Illness on October 17, 1977. The ALJ reached the same conclusion, but further found that the claim was timely because it was filed almost two years before the claimant became "injured" in 1979, and because the employer had "constructive knowledge" of claimant's illness.

We agree with the conclusion reached by the two decisionmakers, although the mistakes as to law we discussed in I. infect the rationales by which they held the claim timely. When Patterson filed on December 9, 1977, he filed within two years [12] of the July, 1977, date at which we hold claimant linked or should have linked his disability, employment, and disease. Consequently, Patterson's claim was timely.

## III. THE BENEFICENCE OF THE EMPLOYER AS TO POST–DISABILITY EMPLOYMENT

■ Traditionally the Benefits Review Board has held that an employee's disability may be gauged in part by the employee's loss of wage-earning capacity relative to the open market. *See, e.g., Van Dyke v. Newport News Shipbuilding & Dry Dock Co.,* 8 Ben.Rev.Bd.Serv. 388, 392 (1978). "The objective is to determine the wage that would have been paid in the open market under normal employment conditions to the claimant as injured. 2 Larson, Workman's Compensation § 57.21, at 10–

101–02 (1983)...." *Long v. Director, Workers' Comp. Programs,* 767 F.2d 1578, 1582 (9th Cir.1985). Thus, where an employee continues to receive wages which are no longer merited given his or her disability, the employee nonetheless may be determined to have sustained an earning capacity loss. According to doctrine espoused by the Board, the ALJ must consider: "[s]uch factors as the beneficence of a sympathetic employer, the claimant's earning power on the open market, whether the claimant is required to expend more time, effort or expertise to achieve pre-injury production, and whether the claimant can perform his pre-injury physical work activities." *Van Dyke,* 8 Ben.Rev.Bd.Serv. at 392–93.

Applying this legal standard, the ALJ concluded from the facts that despite his continued wages Patterson had suffered a loss in earning capacity and thus a compensable disability.[13] R–748–749. The ALJ specifically found that Patterson's post-disability employment was due to "employer benevolence." The Board approved the ALJ's determinations.

■ In assessing the ALJ's decision, we must first review the legal standard proposed by the ALJ and the Board. Three circuit courts appear to have endorsed the view that disability is to be measured by loss of wage-earning capacity rather than by absolute wage decrease. *See Long,* 767 F.2d at 1582 (9th Cir.); *Randall v. Comfort Control, Inc.,* 725 F.2d 791, 795 (D.C. Cir.1984); *Bath Iron Works Corp. v. White,* 584 F.2d 569, 575 (1st Cir.1978). *See also Fleetwood v. Newport News Shipbuilding & Dry Dock,* 776 F.2d 1225, 1232 (4th Cir.1985) (it is "accepted proposition that actual post-injury wages do not necessarily reflect wage-earning capacity"); *Newport News Shipbuilding, Etc. v. Director, Etc.,* 681 F.2d 938, 941–42 (4th Cir.

**12.** For claims such as Patterson's, the 1984 amendments extended the filing period from one year to two. 33 U.S.C. § 913(b)(2).

**13.** We recognize that at least one Board decision has suggested that the "open market" test relates only to the approximation of the loss of wage-

earning capacity, and not to the determination of total disability itself. *See, e.g., Conover v. Sun Shipbuilding,* 11 Ben.Rev.Bd.Serv. 676, 679–80 (1979). The distinction is unconvincing because disability is defined in terms of loss of wage-earning capacity. *See* 33 U.S.C. § 902(10).

1982) (stating that "[w]e have no disagreement with the principle," *id.* at 941, but that it "obviously has no application to one who is already totally disabled by an unrelated cause," *id.* at 942); *Todd Shipyards Corp. v. Allan,* 666 F.2d 399, 402 (9th Cir.), *cert. denied,* 459 U.S. 1034, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982) (ALJ did not err in measuring earning capacity in relation to the open market). Today we follow suit.

■ We note initially that, contrary to the assertion of the Director, the opinions of the Benefits Review Board are not entitled to the special deference due to a policy-making agency construing statutes it is to administer. *Potomac Elec. Power Co. v. Director, Etc.,* 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514–15 n. 18, 66 L.Ed.2d 446 (1980). Nevertheless, based on implications of binding Fifth Circuit precedent in a very similar case, we find we must conclude that the Board has chosen the correct legal standard.

In *Burley Welding Works v. Lawson,* 141 F.2d 964 (5th Cir.1944), a suit under the Longshore and Harbor Workers' Compensation Act, the Fifth Circuit upheld the deputy commissioner's finding that due to urgent wartime demand for welders, Knowles' high post-injury earnings did "not fairly and reasonably represent his wage-earning capacity." *Burley,* 141 F.2d at 966. In affirming that conclusion, the *Burley* court stated that: "[a]n employee who has sustained a permanent or temporary partial disability and who returns to work at the same or higher wages nevertheless may be entitled to compensation if he has sustained a decrease in 'wage-earning capacity.' *Twin Harbor Stevedoring & Tug Co., et al. v. Marshall,* 9 Cir., 103 F.2d 513...." *Burley,* 141 F.2d at 966. In the *Twin Harbor* case, the Ninth Circuit found no reversible error in an ALJ conclusion that the claimant had "been kept on at his former wages, as the evidence shows, because of long service and the sympathetic attitude of his employer." *Twin Harbor Stevedoring & Tug Co. v. Marshall,* 103 F.2d 513, 515 (9th Cir.1939).

In keeping with *Burley,* today we affirm this circuit's position that at the claimant's request the ALJ may examine the claimant's post-disability earnings to determine whether the earnings "fairly and accurately represent" his or her actual wage-earning capacity. As a natural extension of this position, we hold that wage-earning capacity should be measured in terms of the *Van Dyke* factors.

■ Having affirmed the legal standard used by the ALJ and affirmed by the Board, we now examine the ALJ's application of the standard to Patterson's factual situation. The ALJ quoted the *Van Dyke* passage we have adopted, and discussed the application of the *Van Dyke* factors in this case. *See* R–746–749. After a careful review of the record, and given the circumscribed review which we must accord the ALJ's findings of fact, we affirm the determination that Patterson is totally disabled.

## IV. CREDIT FOR WAGES PAID DURING DISABILITY

■ Lastly, Argonaut asks that we credit the post-disability wages paid by Savannah Machine toward the disability payments now owed to Patterson. Under 33 U.S.C. § 914(j), an employer may receive credit for "advance payments of compensation." We need not decide today whether wages may ever be considered advance compensation; Savannah Machine never notified Patterson or the deputy commissioner that payment of compensation had begun. *See* 33 U.S.C. § 914(c) (employer must give deputy commissioner immediate notice when employer makes the first compensation payment). As we established in III., a claimant need not be unemployed to qualify for total disability; consequently, it would be inequitable to allow Savannah Machine to convert the wages to disability payments without having given Patterson prior notification.

The opinions of the Benefits Review Board are AFFIRMED IN PART AND REVERSED IN PART.

JOHNSON, Circuit Judge, concurring in part and dissenting in part:

Although I agree with the majority's treatment of the issues related to timeliness, employer beneficence, and credit for wages paid during disability, I dissent from the majority's conclusion that Continental Insurance Company bears responsibility for the full amount of Arthur Patterson's disability award. I believe this issue is squarely governed by this Court's recent decision in *Jacksonville Shipyards v. Director*, 842 F.2d 1253 (11th Cir.1988). Consequently, I would conclude that Liberty Mutual Insurance Company is the responsible carrier.

In *Jacksonville Shipyards*, this Court noted that Jacksonville Shipyards was the responsible employer and the responsible insurer for the disability award for silicosis to employee William Stokes:

Jacksonville Shipyards stipulated that it had become self-insured on January 1, 1976, and that Stokes had been exposed to dust and silica up until the time he stopped working [on August 12, 1976]. Under the so-called "last injurious exposure" rule applicable to total disability claims, the last employer to have exposed the claimant to injurious stimuli bears full liability for disability compensation, regardless of whether that exposure actually injured the claimant. *See Travelers Ins. Co. v. Cardillo*, 225 F.2d 137, 145 (2d Cir.), *cert. denied*, 350 U.S. 913, 76 S.Ct. 196, 100 L.Ed. 800 (1955). Thus, by stipulating that the last exposure occurred after it became self-insured, Jacksonville Shipyards conceded that it alone was liable for the full amount of Stokes'

compensation claim. Accordingly, the ALJ dismissed Jacksonville Shipyards' former insurance carriers as well as the previous owners of the shipyard and their carriers.

*Id.* at 1255.[1]

The present case involves the following relevant facts:

March or April 1975—Patterson learns he has silicosis and should avoid further exposure to dusty conditions. Argonaut Insurance Company is insuring Patterson's employer, Savannah Machine & Shipyard Company.

June 27, 1977—Patterson becomes ill while sandblasting in the hold of a ship. Continental is Savannah Machine's insurer.

July 11, 1977—Patterson suffers temporary disability until August 1, 1977.

July 15, 1977—Liberty Mutual becomes Savannah Machine's insurer.

November 27, 1977—Because of another exposure to dust, Patterson suffers temporary disability until December 16, 1977.

January 5, 1979—Patterson is determined to be totally disabled from this date.

On these facts and under the *Jacksonville Shipyards'* application of the *Cardillo* rule, it is clear that the "last injurious exposure" to Patterson was after Liberty Mutual became the responsible insurer. Consequently, I would hold Liberty Mutual responsible for the full amount of the total disability award.[2]

---

1. Under the test proposed by the majority in the present case, Jacksonville Shipyards would not be the responsible insurer.

2. The "last injurious exposure" rule also would make Continental liable for Patterson's first temporary disability period and Liberty Mutual liable for the second.

The focus on "last injurious exposure" also accords with congressional policy of protecting the health and safety of workers. Subsequent employers or subsequent insurance carriers are encouraged to make sure that employees suffering from occupational diseases are not subjected to injurious stimuli. In addition, no disin-

centive exists against subsequent employment or insurance because liability is avoided provided the employee is not exposed to injurious stimuli. Consequently, when Liberty Mutual became Savannah Machine's insurer, Continental was responsible for Patterson's disability award. To avoid liability, Liberty Mutual thus had the incentive to make sure that Patterson was not exposed to dust. The majority's approach, however, creates the wrong incentives. Because Continental is the responsible insurer under the majority's rule, Liberty Mutual, the subsequent insurer, has no incentive to make sure that Patterson is not exposed to dust. In addition, because it no longer insures Savannah

Machine, Continental is not in the position to make sure that Patterson is not exposed to dust.

Similarly, the majority rule creates an additional disincentive for protecting the health and safety of workers. Under the majority rule, if Patterson had not been exposed to dust after 1975, Continental still would be the responsible insurer, even if it made sure that Patterson was not exposed to dust. Under the "last injurious exposure" rule, Argonaut would be the responsible carrier.